FILED

2020 Sep-23  PM 01:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **KIARA PERRY,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| **v.** } | **Case No.:  2:18-cv-01572-MHH** |
| } | |
| **GMFS, LLC, et al.,** } | |
| } | |
| **Defendants.** } | |

## MEMORANDUM OPINION AND ORDER

Defendants GMFS, LLC and Specialized Loan Servicing, LLC have asked the Court to enter judgment in their favor in this wrongful foreclosure action. (Docs. 13, 34). The central issue for decision is whether plaintiff Kiara Perry has presented evidence that creates a question of fact regarding her receipt of notices required under the mortgage loan at issue.

## SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, a district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment

must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

When considering a summary judgment motion, a district court must view the evidence in the record and draw reasonable inferences in the light most favorable to the non-moving party. *Asalde v. First Class Parking Sys. LLC*, 898 F.3d 1136, 1138 (11th Cir. 2018). Accordingly, in this opinion, the Court views the evidence in the light most favorable to Ms. Perry and draws all reasonable inferences from the evidence in her favor.[1]

---

[1] In support of their original motion for summary judgment (Doc. 13), the defendants relied on the affidavit of Cynthia Wallace (Doc. 12). Ms. Perry moved to strike information in the Wallace affidavit relating to the authentication of GMFS documents because Ms. Wallace works for SLS, not GMFS. (Doc. 19). In a text order, this Court stated:

> The Court construes Ms. Perry's motion as an objection to the admissibility of summary judgment evidence. *See* FED. R. CIV. P. 56(c)(2). Motions to strike summary judgment evidence no longer are appropriate. *See* FED. R. CIV. P. 56(c)(2) advisory committees note (2010 amendments) ("There is no need to make a separate motion to strike."); *Campbell v. Shinseki*, 546 Fed. Appx. 874, 879 (11th Cir. 2013) ("The plain meaning of [amended Rule 56(c)(2)] show[s] that objecting to the admissibility of evidence supporting a summary judgment motion is now a part of summary judgment procedure, rather than a separate motion to be handled preliminarily...."). The Court asks the Clerk to please TERM Doc. 19. The Court will consider the substance of Ms. Perry's objection in ruling on the pending motion for summary judgment.

# FACTS

On November 1, 2016, Kiara Perry obtained a mortgage loan from GMFS for property located at 229 Lake Forest Way in Maylene, Alabama. (Docs. 32-3, 32-4). Initially, Cenlar, FSB serviced the loan for GMFS. (Doc. 31-1). Specialized Loan Servicing, or SLS, began servicing the loan for GMFS on March 2, 2018. (Doc. 32-52). It is undisputed that Ms. Perry fell behind on her payments and ultimately defaulted on her loan.

Per paragraph 22 of Ms. Perry's mortgage agreement with GMFS, in the event of a default under the agreement, GMFS had to give Ms. Perry notice of her default, an opportunity to cure the default, and notice of GMFS's option to accelerate the loan and sell the mortgaged property if she did not cure the default. Paragraph 22 states:

> 22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach . . .. The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to

---

(Doc. 20). In their supplemental motion for summary judgment (Doc. 34), GMFS and SLS rely on deposition testimony and the exhibits to that testimony. (Docs. 32 and 33). Ms. Perry has not objected to that evidence. The Court has relied on the defendants' new evidence and has not considered the evidence to which Ms. Perry objects in the Wallace affidavit. Because the Court has not relied on the portions of Ms. Wallace's affidavit concerning GMFS documents, Ms. Perry's objection is moot.

acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law.

(Doc. 32-4, p. 14, ¶ 22).

The defendants contend that after Ms. Perry defaulted, but before GMFS accelerated her loan and scheduled the property for a foreclosure sale, over the course of four months, Cenlar, on behalf of GMFS, sent Ms. Perry three notices of default dated January 17, 2017, March 21, 2017, and April 26, 2017, respectively. (Docs. 32-69, 32-70, 32-71). The defendants also contend that GMFS's foreclosure counsel, the law firm of Sirote & Permutt, PC, sent Ms. Perry a notice of acceleration dated July 20, 2017. (Doc. 31-4, p. 2, ¶ 7; Doc. 31-4, p. 4; Doc. 32-72). During this time, Ms. Perry's mother, Karen Perry, was living with her at 229 Lake Forest Way. Ms. Perry and her mother have submitted affidavits in which each woman states that she received neither the notices of default nor the notice of acceleration. (Doc. 17-1, p. 3, ¶¶ 13–14; Doc. 17-2, pp. 3–4, ¶¶ 18–19).[2]

In support of their summary judgment motions, GMFS and SLS have submitted the declaration of Diane McCormick, who describes herself as "vice president—document examination" at Cenlar. (Doc. 31-1, p. 1, ¶ 1). Ms.

_____

[2] References to "Ms. Perry" are to Ms. Kiara Perry, the plaintiff.

McCormick reviewed Cenlar's "electronic 'letter log,' which tracks letters sent to borrowers." (Doc. 31-1, p. 1, ¶ 3). According to Ms. McCormick, "[i]f a letter is recorded on Cenlar's letter log, it reflects the fact a copy of the letter was mailed to a borrower." (Doc. 31-1, p. 2, ¶ 4). Ms. McCormick states: "I reviewed the January 17, 2017, March 21, 2017 and April 26, 2017 notices of default for this loan . . . I compared these Notices with the letter log for Ms. Perry's loan, and was able to confirm that the three Notices were in fact sent to Ms. Perry." (Doc. 31-1, p. 2, ¶ 5).

Ms. McCormick also states that the letter log indicates that Cenlar sent all three letters by certified mail. (Doc. 31-1, pp. 2–3, ¶¶ 6–8). In her deposition, Loretta Poch, SLS's corporate representative, testified that Cenlar did not receive documents indicating that the notices were returned. (Doc. 33-1, p. 21, tp. 122). Ms. Poch also testified that there is no signed receipt or other evidence indicating that Ms. Perry received the three certified letters. (Doc. 33-1, p. 10, tp. 34; Doc. 33-1, p. 20, tpp. 74–75).

GMFS and SLS also have submitted the declaration of Rebecca Redmond, an attorney at Sirote. (Doc. 31-4, p. 1, ¶ 1). Ms. Redmond states that "Sirote sent a letter, dated July 20, 2017, to Perry, notifying her that her loan, which was in default, was being accelerated." (Doc. 31-4, p. 2, ¶ 7). The declaration continues: "[A]fter I executed the letter, it was imaged and uploaded/saved to Sirote and GMFS, LLC's respective case management systems and then subsequently routed to the mail room

to be processed and mailed to [Ms.] Perry." (Doc. 31-4, p. 2, ¶ 8). According to Ms. Redmond, "[the] letter was properly addressed, with adequate postage affixed, and sent First Class Mail via the United States Postal Service. There is no indication in our file that the July 20, 2017 letter was returned to Sirote as 'undeliverable' by the postal service." (Doc. 31-4, p. 3, ¶ 9).

After default, but before foreclosure, Ms. Perry and GMFS engaged in the loss mitigation process, to no avail. Ms. Perry does not dispute that Sirote sent her, and that she received, a notice of foreclosure sale dated August 1, 2017. (Doc. 32-28). That notice scheduled the foreclosure sale for October 11, 2017. Sirote advertised the sale as required under Alabama law. Ms. Perry also does not dispute that she received monthly mortgages statements dated October 18, 2017 (Doc. 32-36) and November 20, 2017 (Doc. 32-44), both of which showed that GMFS had accelerated the loan and that the loan was in foreclosure.

On November 15, 2017, Sirote sent Ms. Perry a second notice of foreclosure sale, scheduling the sale for January 26, 2018. (Doc. 32-43). Again, Sirote advertised the sale as required under Alabama law. From March 2018 through August 2018, SLS sent monthly statements to Ms. Perry that stated that GMFS had accelerated the loan and that the loan was in foreclosure. (Docs. 32-54, 32-58, 32-62, 32-64, 32-66, 32-68).

On June 18, 2018, Sirote sent a final notice of foreclosure setting a sale date of August 21, 2018.  (Doc. 32-65).  That notice stated that GMFS had accelerated the loan.  On August 21, 2018, GMFS foreclosed on the property securing the loan. (Doc. 33-33).

## ANALYSIS

Ms. Perry asserts that GMFS and SLS violated the Real Estate Settlement Procedures Act, 12 U.S.C. § 2605 (RESPA) (Doc. 1-1, pp. 31–32, ¶¶ 216–224) (Count I); that GMFS and SLS violated the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.* (TILA) (Doc. 1-1, p. 33, ¶¶ 225–230) (Count II); and that SLS violated the Fair Debt Collections Practices Act, 15 U.S.C. § 1692, *et seq*, (FDCPA) (Doc. 1-1, pp. 34–41, ¶¶ 231–260) (Counts III through XII).  In her reply to the original motion for summary judgment, Ms. Perry withdrew Counts VIII and XII.  (Doc. 18, p. 18, n.10).

Ms. Perry also asserts that GMFS is liable under state law for breach of contract (Doc. 1-1, pp. 41–42, ¶¶ 261–271) (Count XIII); that GMFS and SLS "negligently, wantonly, and/or intentionally hired, retained, or supervised incompetent employees or agents" (Doc. 1-1, p. 45, ¶ 285) (Count XV); that GMFS and SLS are liable for negligence and wantonness (Doc. 1-1, pp. 45–46, ¶¶ 286–291) (Count XVI); and that GMFS and SLS are liable for invasion of privacy (Doc. 1-1,

pp. 46–50, ¶¶ 292–305) (Count XVII).  Finally, Ms. Perry seeks a declaration that "foreclosure is not allowed."  (Doc. 1-1, p. 43, ¶ 274) (Count XIV).

Potential liability on each of Ms. Perry's claims turns, to some extent, on whether Cenlar provided Ms. Perry with the three notices of default dated January 17, 2017, March 21, 2017, and April 26, 2017 respectively and whether Sirote provided Ms. Perry with the July 20, 2017 notice of acceleration.  GMFS and SLS seek summary judgment "with respect to [Ms. Perry's] claims for violation of the FDCPA, TILA and RESPA based on allegations related to the mailing of the Notice[s] of Default and Notice of Acceleration," "[Ms. Perry's] RESPA claim related to loss mitigation activity, [the state law claims for] negligent or wanton conduct, negligent supervision and hiring of incompetent employees, and her claim seeking a declaration prohibiting foreclosure of the property."  (Doc. 34, pp. 3–4; *see also,* Doc. 34, p. 2).  GMFS also seeks summary judgment as to the breach of contract claim, to the extent that claim is based on the alleged failure to send a notice of foreclosure.  (Doc. 34, p. 12; Doc. 37, p. 6). The Court begins with Ms. Perry's federal law claims and then considers the defendants' arguments concerning some of Ms. Perry's state law claims.

## Counts I–VII, IX-XI, XIII:  Remaining FDCPA, TILA, and RESPA Claims and Breach of Contract Claim

Ms. Perry argues that her RESPA and TILA claims "are based on the false statements in the mortgage statements, which she admits receiving, stating that the

loan had been accelerated or was in foreclosure or was in a foreclosure process when such was not true under Alabama law." (Doc. 36, p. 13). For her FDCPA claims, Ms. Perry alleges that GMFS and SLS, *inter alia*, "[engaged in] conduct constituting misrepresentations[] that were false and untrue," "threatened to take legal action, such as foreclose[ure], which defendants could not legally take," and "threat[ened] to take property when it was illegal to do so." (Doc. 36, p. 14). Ms. Perry's breach of contract claim is based on her allegation that GMFS violated paragraph 22 of her mortgage. (Doc. 1-1, pp. 41-42; Doc. 18, pp. 14-17).

According to Ms. Perry, paragraph 22 of her mortgage requires GMFS to "give" her certain notices. She contends that GMFS and SLS did not send her the default notices required under paragraph 22. (Doc. 1-1, p. 18, ¶ 112). Ms. Perry asserts that in the absence of a default notice, "no acceleration can occur," and "no foreclosure was allowed." (Doc. 1-1, pp. 18–19, ¶¶ 113, 114; *see also*, Doc. 1-1, pp. 20–25, ¶¶ 127, 134, 142, 144, 152, 165–169). Accordingly, a statement that the mortgage is in default or that the amount due is accelerated is false. Similarly, any attempt to foreclose is illegal.

The parties seem to agree that evidence of Ms. Perry's receipt of the notices is the crux of the matter. The parties focus their briefs on the "mailbox rule" which is the "'rebuttable presumption that an item properly mailed was received by the addressee.'" *Barnett v. Okeechobee Hosp.*, 283 F.3d 1232, 1239 (11th Cir. 2002)

(quoting *Konst v. Fla. E. Coast Ry. Co.*, 71 F.3d 850, 851 (11th Cir. 1996)).  The

"'presumption of receipt' arises upon proof that the item was properly addressed,

had sufficient postage, and was deposited in the mail.'" *Green v. Hooks*, 798 Fed.

Appx. 411, 425 (11th Cir. 2020) (quoting *Konst*, 71 F.3d at 851); *see also Barnett*,

283 F.3d at 1240.  "The presumption is, of course, rebuttable."  *Konst*, 71 F.3d at

851.

> [T]he presumption of receipt is "not a conclusive presumption of law,
> but a mere inference of fact, founded on the probability that the officers
> of the government will do their duty and the usual course of business;
> and, when it is opposed by evidence that the letters never were received,
> must be weighed with all the other circumstances of the case ... in
> determining the question whether the letters were actually received or
> not."

*Barnett*, 283 F.3d at 1240 (quoting *Rosenthal v. Walker*, 111 U.S. 185, 193–94,

(1884) (citation in *Rosenthal* omitted)).

Absent evidence that the three notices were "properly addressed, had

sufficient postage, and [were] deposited in the mail," the Court may not presume

receipt.  *Konst*, 71 F.3d at 851.  Ms. Perry argues that the information in Ms.

McCormick's declaration concerning Cenlar's letter log is not sufficient to give rise

to a presumption of receipt.  In her declaration, Ms. McCormick states that the three

notices that Cenlar prepared regarding Ms. Perry's account are referenced on

Cenlar's letter log and that "[i]f a letter is recorded in Cenlar's letter log, it reflects

the fact [that] a copy of the letter was mailed to a borrower."  (Doc. 33-5, p. 2, ¶ 4).

10

Ms. McCormick also states that the notices state on their face that they were addressed to Ms. Perry, and Cenlar used certified mail to send the notices. (Doc. 33-5, pp. 2-3; *see also* Doc. 33-6).

This is not the type of information that a party ordinarily presents to support a presumption of receipt. In contrast, Ms. Redmond states in her affidavit that she, on behalf of Sirote, prepared and sent the acceleration notice and that the acceleration notice was "properly addressed, with adequate postage affixed, and sent First Class Mail via the United States Postal Service." (Doc. 31-4, pp. 2-3, ¶¶ 8-9). This is typical of the testimony that supports a presumption of receipt. Here, the Court does not have to decide whether the information in Ms. McCormick's declaration is sufficient to trigger the mailbox presumption because Ms. Perry has provided sufficient evidence to create a question of fact concerning her receipt of the notices.

Ms. Perry asserts, and her mother confirms, that she (Ms. Perry) did not receive the three notices from Cenlar. (Doc. 17-1, p. 3, ¶ 13; Doc. 17-2, p. 3, ¶ 18). In *Barnett*, the Eleventh Circuit Court of Appeals stated: "If a court needed to resolve whether an individual person received an item mailed to him or her, then it need only seek testimony from that person as to whether he or she had received the item." *Barnett*, 283 F.3d at 1241. The statement in *Barnett* is dicta, but the dicta provides helpful guidance. So does the analysis in *In re Farris*, 365 Fed. Appx. 198

11

(11th Cir. 2010). In that unpublished bankruptcy decision, the viability of a debtor's

case turned on whether the record established that he received notice of a hearing at

which he failed to appear. The Eleventh Circuit found that the mailing of the notice

of the hearing created a rebuttable presumption that the debtor received the notice.

Then, the panel explained:

> "The presumption of receipt may be rebutted ... by producing evidence
> which would 'support a finding of the non-existence of the presumed
> fact.'" *In re Prescott*, [285 B.R. 763, 767 (Bankr.S.D.Ga.2001)]. The
> mere denial of receipt, without more, is insufficient to rebut the
> presumption. *Id*.; *In re Hobbs*, 141 B.R. 466, 468
> (Bankr.N.D.Ga.1992). But direct testimony of nonreceipt, combined
> with other evidence, may be sufficient to rebut the presumption. *In re
> Hobbs*, 141 B.R. at 468.

*In re Farris*, 365 Fed. Appx. at 200. In *Farris*, the debtor did not rebut the

presumption of receipt because he offered only his "denial that he received notice."

*In re Farris*, 365 Fed. Appx. at 200.

Here, Ms. Perry has offered more than her "mere denial of receipt." Both Ms.

Perry and her mother have described their "procedure for receiving and filing

incoming mail." *Barnett*, 283 F.3d at 1241; *see Weiss v. Macy's Retail Holdings,

Inc.*, 741 Fed. Appx. 24, 28 (2d Cir. 2018) (individual rebutted the mailbox

presumption by providing "evidence of his family's regular procedure for reviewing

with him the mail he received and asserted, with sworn support, that the relevant

mailings did not arrive and go through that process").

In her affidavit, Ms. Perry states:

5.      There is a single mailbox for the house that we do not share with anyone else outside the family.

6.      My mother and I have exclusive control over the mailbox.

7.      I typically work during the day from about 4:45 a.m. until about 5 p.m. when I return from my job with Alabama Power Company. Consequently, my mother typically picks up the mail from the mailbox.

8.      My mother typically handles the mail and opens and reviews it and places it in a drawer in her desk until we pay bills or need it for some other reason.

9.      My mother checks the mailbox daily and sorts, opens, reviews and stores the mail on a daily basis as well.

10.     I recall receiving various letters from GMFS pertaining to our mortgage loan after we moved into the house and then later also from SLS once the servicing transferred to them.

11.     At least once a month, we would pull the mail out and pay the bills that needed to be paid. Afterward she would store it in another drawer in her desk and once that was too full, transfer it to a storage bin. We would keep mail that was needed and throw away ones that we did not need.

12.     We kept letters we received from GMFS and SLS in this same manner.

* * *

16.     During this time period, we consistently received other mail such as, bank statements, utility bills, credit card bills and magazine subscriptions.

17.     I do not recall ever having problems receiving mail that was sent to us.

(Doc. 17-1, pp. 2-4, ¶¶ 5-12, 16-17).

Similarly, Ms. Perry's mother, Karen Perry, states in her affidavit:

6.      There is a single mailbox for the house that we do not share with anyone  else outside the family and we have exclusive control over the mailbox.

7.      I am typically home during the day, so I am the one who picks up the mail from the mailbox and my custom and habit is to check the mailbox daily.

8.      The mail is usually delivered between 11 a.m. and 1 p.m. and I will normally retrieve the mail within an hour or two of it being delivered.

9.      Once I retrieve the mail, I would normally go back inside and sit down at my desk in the living room and sort the mail between my mail and Kiara's and also by whether it is a bill or some other type of mail.

10.     I typically open all the mail shortly after going to mailbox or at the latest on the same day.

11.     I do not throw any of the mail away until I have opened it and read it to see what it is and if I need to respond to it or if it is a bill that needs to be paid.

12.     I recall receiving various letters from GMFS pertaining to our mortgage loan after we moved into the house and then later also from SLS once the servicing transferred to them.

13.     After reviewing the mail, I put it in a drawer where it stays until I need to use it to pay bills.

14.     At least once a month, I would pull the mail out and pay the bills that need to be paid. Once, I'm finished with it, I transfer the mail to another drawer in my desk where I keep older mail that I have handled or addressed.

15.     If the drawer gets full, I then transfer the mail to a plastic utility [bin] unless we had no need for the mail and then we would throw it away.

16.     We kept the letters I received from GMFS and SLS in this same manner.

17.     I stored those letters in same place until [I] provided [them] to my attorneys.

                                              * * *

20.     During 2017-2018, I do not recall taking any extended vacation or going away from residence for any extended period of time around [the time of the  supposed mailings of these letters.

21.     During this time period, I consistently received other mail such as[] bank statements, utility bills, credit card bills, magazine subscriptions and had no problems with mail not being delivered.

(Doc. 17-2, pp. 2–4, ¶¶ 6–17, 20–21).   This evidence is enough to rebut the presumption of receipt.[3]

_____

[3] In their supplemental motion, GMFS and SLS argue that Ms. Perry's evidence is "weakened by the fact that Plaintiff's mother was largely absent from the Property during the time the Notices were being sent (*see, e.g.* Deposition of Kiara Perry, Doc. 32-1, at 136:9-21 and 137:13-21), and by the fact that Plaintiff's mother, who frequently spoke to GMFS and SLS while posing as Plaintiff, appears to reference the March 21, 2017 Notice during a phone call (Deposition of Karen Perry, Doc. 32-78, at 23:5-25:21; see also Declaration of Robert Miller, Doc. 31-5, at ¶ 3)." (Doc. 34, pp. 8-9).   But the defendants have not asked the Court to strike Ms. Perry's affidavit evidence. *See, e.g., Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986) ("An affidavit may . . . be disregarded as a sham 'when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact ... [and that party attempts] thereafter [to] create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.'") (quoting *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc*., 736 F.2d 656, 657 (11th Cir. 1984)).   And whether the affidavit evidence "weakens" Ms. Perry's case is a question of the weight of the evidence for the trier of fact.   When ruling on a motion for summary judgment, "[t]he court does not weigh conflicting evidence or determine the credibility of witnesses." *A.L. by & through D.L. v. Walt Disney Parks & Resorts US, Inc*., 900 F.3d 1270, 1289 (11th Cir. 2018).

In addition, the record demonstrates that Cenlar sent the three notices of default by certified mail, but Cenlar did not receive return certified mail receipts for the notices.

On this record, a genuine dispute of material fact exists as to whether Ms. Perry received the notices of default from Cenlar.  Therefore, the Court will deny summary judgment as to Ms. Perry's federal claims.[4]  The Court also will deny GMFS's motion for summary judgment on Ms. Perry's breach of contract claim.

**Counts XV, XVI:  Negligent or Wanton Conduct, and Negligent Supervision and Hiring of Incompetent Employees**

Ms. Perry offers a glancing response to the defendants' request for summary judgment on these negligence/wantonness claims, and she cites no authority to oppose the defendants' legal arguments.  (Doc. 18, pp. 23-24).  Her conclusory assertions – like, "how else would the conduct of Defendants be described but as negligent and wanton to take ownership of a house (via foreclosure deed) when there is no right to do so," (Doc. 18, p. 24) – are not an adequate response to a summary

---

[4] Ms. Perry bases her RESPA claim in part on GMFS and SLS's loss mitigation activity.  In their initial motion for summary judgment, GMFS and SLS moved for summary judgment as to this aspect of the RESPA claim.  (Doc. 13, pp. 14-19).  Neither Ms. Perry's response to the first motion, nor her response to the supplemental motion, addresses this argument.  (*See generally* Docs. 18, 36); *see Edmondson v. Bd. of Trustees of Univ. of Alabama*, 258 Fed. Appx. 250, 253 (11th Cir. 2007) ("Edmondson did not respond to UAB's motion for summary judgment on the Equal Protection Act claim. Therefore, she has abandoned it.") (citing *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995)).  Ms. Perry has abandoned her RESPA claim in Count I to the extent that it is based on loss mitigation activity.  The Count will grant summary judgment on Count I to the extent that it is based on that conduct.

16

judgment motion.  Therefore, the Court will enter judgment for the defendants as to Counts XV and XVI.

### Count XIV: Ms. Perry's Claim for a Declaration that "Foreclosure Is Not Allowed"

"A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome." *Atheists of Fla., Inc. v. City of Lakeland, Fla.*, 713 F.3d 577, 593–94 (11th Cir. 2013) (internal quotations and citations omitted).  As noted by GMFS and SLS, this claim is moot because the foreclosure sale already has occurred.  (Doc. 25, p. 6).  Although Ms. Perry states in her brief that she is now seeking "a ruling on whether [the] foreclosure was proper" (Doc. 18, p. 23), she will receive that ruling if she succeeds on her breach of contract claim.  The Court will grant summary judgment in favor of the defendants as to Count XIV.

## CONCLUSION

For the foregoing reasons, the Court grants summary judgment in favor of GMFS and SLS as to Counts XIV, XV, and XVI and dismisses Counts VIII and XII. The Court also grants summary judgment in favor of GMFS and SLS as to Count I to the extent that count is based on loss mitigation activity.  In all other respects, the Court denies the defendants' motion for summary judgment (Doc. 13) and supplemental motion for summary judgment (Doc. 34).

**DONE** and **ORDERED** this September 23, 2020.

_____

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE